Opinion filed August 31, 2006

















 
 
  
 
 







 
 
  
 
 




Opinion filed August 31, 2006

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh Court of Appeals

                                                                 ____________

 

                                                          No. 11-05-00058-CV 

                                                    __________

 

                                     VICTOR ANDREWS, Appellant

 

                                                             V.

 

                                 DT
CONSTRUCTION, INC., Appellee

 



 

                                         On
Appeal from the 269th District Court

 

                                                          Harris County,
Texas

 

                                               Trial
Court Cause No. 2002-06286

 



 

                                                                   O
P I N I O N

 








Victor Andrews sued for injuries he received while
working as an electrician for Brien Call Electric.  Brien Call Electric was a subcontractor to
the general contractor, DT Construction, Inc., at a construction project at C.E. King High School.  As Andrews=s
lawyer succinctly stated in his opening statement, AVictor
Andrews, as he was climbing down the scaffold, fell when the scaffold tipped
over.@  The jury found Andrews to be 75% negligent
and DT Construction to be 25% negligent. 
Andrews argues that there was legally insufficient evidence for the jury
to find contributory negligence and factually insufficient evidence for the
jury to find Andrews to be 75% negligent and DT Construction to be 25%
negligent.  We affirm.

Standard of Review

In analyzing Andrews=s
no-evidence challenge, we must determine whether the evidence at trial would
enable reasonable and fair-minded people to reach the verdict under
review.  City of Keller
v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).  We must review the evidence in the light most
favorable to the verdict, crediting any favorable evidence if a reasonable
fact-finder could and disregarding any contrary evidence unless a reasonable
fact-finder could not.  Id. at 821-22, 827.  We may sustain a no-evidence or legal
sufficiency challenge only when (1) the record discloses a complete absence of
a vital fact, (2) the court is barred by rules of law or of evidence from
giving weight to the only evidence offered to prove a vital fact, (3) the only
evidence offered to prove a vital fact is no more than a mere scintilla, or (4)
the evidence conclusively establishes the opposite of a vital fact.  Id.
at 810 (citing Robert W. Calvert, ANo
Evidence@ and AInsufficient Evidence@ Points of Error, 38 Texas L. Rev. 361, 362-63 (1960)).  

In reviewing appellant=s
factual sufficiency challenge, we must consider and weigh all of the evidence
and determine whether the evidence in support of the jury=s finding is so weak as to be clearly
wrong and unjust or whether the finding is so against the great weight and
preponderance of the evidence as to be clearly wrong and manifestly
unjust.  Dow Chem. Co. v. Francis,
46 S.W.3d 237, 242 (Tex. 2001); Pool v.
Ford Motor Co., 715 S.W.2d 629 (Tex.
1986); In re King=s
Estate, 244 S.W.2d 660 (Tex.
1951).  When conducting a factual
sufficiency review, we cannot substitute our judgment for that of the
jury.  Pool, 715 S.W.2d at
635.  The jury is the sole judge of the
credibility of the witnesses and the weight to be given to their
testimony.  Jones v. Tarrant Util.
Co., 638 S.W.2d 862, 866 (Tex.
1982).

Legal Sufficiency of the Evidence on
Contributory Negligence

In Andrews=s
first issue, he contends that there was no probative evidence to support the
jury=s finding
of contributory negligence on his part.  We disagree. 









Contributory negligence contemplates an injured
person=s failure
to use ordinary care in regard to his or her own safety.  This affirmative defense requires proof that
the plaintiff was negligent and that the plaintiff=s
negligence proximately caused his or her injuries.  Kroger Co. v. Keng, 23 S.W.3d 347, 351
(Tex. 2000); Ned
v. E.J. Turner & Co., 11 S.W.3d 407, 408 (Tex. App.CHouston [1st Dist.] 2000, pet. denied).

Andrews testified that he had worked as an
electrician for numerous companies, holds a journeyman=s
license from the State,[1]
had experience working on scaffolds, and had been on regular scaffolds many times
in the past.  Andrews described a regular
scaffold as being a permanent fixture until it is torn down, and he pointed out
how a Baker scaffold is different from a regular scaffold:

A Baker scaffold is - - or a painter=s scaffold, . . . is narrow, say, six
feet long, and is mobile, it has wheels on it, and you move [it] from place to
place.

 

Andrews had assembled a Baker scaffold before and had used the
scaffold; however, it was not a stacked scaffold.  Andrews said that the Baker scaffold he used
when he was injured consisted of two separate scaffolds and that he and his
coworker stacked them on top of each other.

John Beadles, an acting labor foreman for DT
Construction that day, described the Baker scaffold as a narrow scaffolding
that was designed to be extended not more than four to five feet high and to
hold no more than one person at a time. 
John Beadles said Andrews had stacked two separate Baker scaffolds to
give him an extension of eight to ten feet.

Andrews testified that he knew the scaffold had
been properly put together because A[i]t=s pretty much common sense.  The scaffold went together one way.  There was no other way to put it together.@ 
He said that he made sure that the pins were inserted and the bolts were
locked to keep the two scaffolds together. 
He acknowledged that Mike Makalic, Brien Call Electric=s foreman, told him how to stack the
two scaffolds.  Andrews did not ask
Makalic to check the assembled scaffolding because it could only be put
together one way.








In describing the accident, Andrews said that he
was climbing down and the scaffold fell over. 
John Beadles testified that the pins that locked the two scaffolds had
not been inserted properly to secure the two scaffolds together because, after
the accident, he saw that one of the braces had come apart and Athe key to lock the scaffolding in
place was laying [sic] on the floor unattached.@  Andrews thought that the locking pin for that
brace may have fallen out after the scaffold crashed to the ground because A[t]he scaffold hit hard.@ 
Andrews believed that he put the pins in correctly when he put the
scaffolding together.

Andrews agreed that Brien Call Electric was the
one responsible for providing him with the proper equipment and safety
items.  Andrews also admitted that he had
seen safety films, attended safety meetings, and had safety training at various
companies where he had worked.  Andrews
also agreed that everyone has the responsibility to watch out for hazards on
the job.  He had learned from experience
that, before starting an activity on the job site, one should look around for
obvious dangers.  He also had enough
experience with scaffolding that he knew how to check the scaffold to see if it
was stable and secure B
that was common sense.  Andrews could not
think of anything that DT Construction did wrong except Ahave
had better safety personnel or [a safety] director.@  Andrews admitted that no one at DT
Construction had ever told him how to do his job or supervised his work.

Andrews testified that he believed that, if the
scaffold had had outriggers or stabilizers, he would not have fallen.  He pointed out that outriggers are used to
keep the Baker scaffold from tipping over.

Robert Bennett was the only superintendent for DT
Construction on that day; the head superintendent, Patrick Andrew Beadles, was
on vacation.  John Beadles testified
that, shortly after the accident, Bennett asked him to take pictures of the
fallen scaffold.  The pictures were
introduced into evidence and showed an extremely narrow, tall scaffold on
wheels. At the request of DT Construction=s
president, John Beadles put in a written statement what he remembered about the
accident.  He stated in part:

I
did not see the actual accident but was a witness to the commotion and I took
pictures of the scene after the accident occurred.  As I arrived on the scene I witnessed that
the scaffolding, being used by Mr. Andrews, was overturned on the floor with
one of the braces unsecured.  I knew that
the scaffolding had been unsecured before anyone got on it because the key to
lock the scaffolding in place was laying [sic] on the floor unattached.

 








After
reviewing the accident scene it appears that Mr. Andrews was using the
scaffolding improperly.  The scaffolding
that was being used is called Bakers Scaffold. 
It=s a
narrow scaffolding that is designed to be extended no more than 4 to 5 feet and
to hold no more than one person at a time. 
Mr. Andrews had taken two separate Bakers Scaffolds and stacked them on
top of each other, without proper bracing, to allow him to have an extension of
8 to 10 feet.  In addition to his own
weight he allowed another Brien Call Electric employee to get on the unsecured
scaffolding with him.

 

In
my opinion, the increased weight along with the unsecured bracing caused the
scaffolding to become unstable and eventually collapse.  I feel that this accident occurred due to the
negligence of Mr. Andrews.

 

John Beadles acknowledged at trial that he really
did not know why the scaffold fell.  He
agreed that, if he had seen the scaffold the day before, he would have tried to
stop the unsafe use of the scaffold. 
Beadles said that the band hall was a big area with two parts and that,
even if he had walked through the band hall, he might not have seen the
scaffold.  The construction site covered
three city blocks.

Brien Call of Brien Call Electric also
testified.  He stated that Brien Call
Electric had done several jobs for DT Construction of a similar nature,
although not as large.  Mike Makalic was
his foreman on the job and was in charge of sixteen to twenty employees at the
site.  Brien Call was a master
electrician and would visit the site once or twice a week to inspect the
job.  Although Brien Call also had a job
as a flight attendant with Continental Airlines, he spoke with Patrick Beadles
on a daily basis concerning the job and its progress.

Brien Call stated that he hired the electricians
as subcontractors to Brien Call Electric. 
He testified that safety was the individual electrician=s responsibility just as his safety was
his responsibility and not DT Construction=s
responsibility.  The electricians would
use equipment rented by Brien Call Electric. 
The electricians were required to have certain tools of their own such
as tall ladders and drills, but he supplied other tools the men used.  Brien Call stated more than once that safety
was Andrews=s
responsibility.








Don Thompson, president of DT Construction,
testified that a Baker scaffold is not made to be stacked but that, if Ait is stacked[,] it has to have
outriggers.@  Thompson described a Baker scaffold as being
only eighteen inches to twenty-four inches wide and eight feet long, usually
with an aluminum walk board.  He stated
that it should not go over six feet in height without a device on the bottom
that extends the legs out three feet on each side to make a more stable
platform.  He contrasted the Baker
scaffold with the normal scaffold Athat
is four or five foot deep [wide].@  Thompson testified that it would be obvious
that someone should not stack Baker scaffolds without widening the base because
Acommon sense tells you that you don=t get on something that=s sixteen, eighteen foot in the air
with a two foot base and rollers on it.@  Thompson also testified that he had been told
by another subcontractor, a Mr. Macallis, that the scaffolding looked unsafe
and that Mr. Macallis had offered to let them use a motorized scissor
lift.  Thompson believed that, under the
subcontract, Andrews was responsible for his own safety.

Andrews called John Beadles as a witness at the
trial.  Yet Andrews now argues that the
testimony and statement of John Beadles should be ignored as being no evidence
of probative value.  He first argues that
John Beadles Amerely
assumed that Mr. Andrews failed to assemble the scaffold correctly.@ 
Our view is that John Beadles drew a reasonable inference B that Andrews had not properly locked
the two scaffolds together B
from seeing the key to lock the scaffolding in place lying on the floor
unattached.  The jury could have drawn
the same inference.  But the most obvious
and reasonable inference is that the scaffold simply tipped over because of the
shifting weights of Andrews and his coworker, regardless of when the one brace
came apart.

Andrews argues that John Beadles was not qualified
to offer his opinion that Athe
increased weight [of Andrews and the coworker] along with the unsecured bracing
caused the scaffolding to become unstable and eventually collapse.@ 
Beadles only stated what any layman might state given the obvious
unstable nature of the scaffold.  Andrews
is correct that the determination of whether expert testimony was necessary is
a question of law and is reviewed de novo on appeal.  FFE Transp. Servs., Inc. v. Fulgham,
154 S.W.3d 84 (Tex.
2004).








            Expert testimony is necessary only when the alleged
negligence is of such a nature as not to be within the experience of the
layman.  Melody Home Mfg. Co.
v. Barnes, 741 S.W.2d 349, 355 (Tex. 1987)
(holding that the Ajurors
had sufficient knowledge@
without expert testimony because the standard was within the common knowledge
of laymen); Roark v. Allen, 633 S.W.2d 804, 809 (Tex. 1982). 
In his opening statement, Andrews=s
counsel stated that the scaffold simply tipped over when Andrews started
climbing down.  Andrews testified to that
fact.  Expert testimony was not required
to support a conclusion by the jury that the scaffold tipped over because of
Andrews=s actions
and weight shifts in climbing down or the shifting weights of two people moving
about on the scaffold or that Andrews=s
actions and weight shifts caused one of the four braces to come apart and the
scaffold then tipped over.  The essential
point is that the scaffold would not have tipped over but for the actions of
Andrews.  There was uncontradicted
testimony by John Beadles that only one person should be on a Baker
scaffold.  The jury could see from the pictures
(and heard from Thompson, John Beadles, and Andrews) that outriggers were
needed because the scaffold was tall and narrow and that it was obvious to
anyone that the scaffold could easily tip over unless something like outriggers
were used to widen the base.  The jury
heard testimony from Thompson that another contractor told them that the
scaffold looked unsafe and offered to let them use a motorized scissor
lift.  They refused his offer.  

Andrews relies on Ned, 11 S.W.3d 407, in
arguing that there was no evidence in the record to justify the jury=s finding that Andrews was
negligent.  We find that Ned is
distinguishable.  The Houston court found that there was no
evidence to show that any of Ned=s
acts were either a cause in fact of the accident or that the accident was
foreseeable as a result of anything he did. 
The Houston
court pointed out that Salazar, a front end loader operator for E.J. Turner and
Company, positioned the bucket under the sandblaster, lifted it, and began to
move it in the loader bucket.  As Salazar
was moving it, the sandblaster fell out and struck Ned.

In analyzing contributory negligence in our case,
there were only the acts of Andrews to be considered.  Andrews put the stacked Baker scaffold
together, considered the assembly to be a matter of common sense, inserted the
pin to lock the scaffolds, was warned by another subcontractor that the
scaffolding looked unsafe, was offered use of a motorized scissor lift, and
tipped the scaffold over by climbing down. 
Most significantly, there was substantial testimony that any reasonable
person would see that the Baker scaffold B
due to its narrow width, height, and rollers B
was obviously unstable unless it had some type of bracing such as
outriggers.  Andrews presented no
evidence of another hypothesis as to why the scaffold tipped over.

The standards and tests for determining whether a
plaintiff=s conduct
constituted contributory negligence are the same as those by which the
negligence of a defendant is determined, and the rules of law applied to
contributory negligence are the same as those applied to primary
negligence.  Carney v. Roberts Inv.
Co., 837 S.W.2d 206, 208 (Tex. App.CTyler
1992, writ denied).  The evidence was
legally sufficient to support the jury=s
finding of contributory negligence on the part of Andrews.  We overrule appellant=s
first issue.








Legal and Factual Sufficiency of the Evidence
on Proportionate Responsibility

Under Tex.
Civ. Prac. & Rem. Code Ann. '
33.001 (Vernon
1997), Andrews recovered no damages because the jury found his percentage of
responsibility for his injuries was greater than fifty percent.  We turn first to the jury=s finding that DT Construction was
twenty-five percent responsible for Andrews=s
injuries.

To impose liability on DT Construction, DT
Construction must have owed a duty to Andrews and breached that duty, and that
breach must have caused Andrews=s
injury.  Andrews had been working on the
scaffold while installing electrical wiring in the ceiling of the school=s band hall.  The ceiling was fourteen feet high from the
finished concrete floor to the bar joint. 
Appellant was injured while attempting to climb down from the scaffold
that he had assembled and that was furnished by Brien Call Electric.  It is undisputed that no one from DT Construction
had anything to do with the scaffold or even saw the scaffold before the
accident.

Generally, a premises owner or general contractor
does not have a duty to ensure that an independent contractor safely performs
his work.[2]  Lee Lewis Const., Inc. v. Harrison,
70 S.W.3d 778, 783 (Tex. 2001); Abalos v.
Oil Dev. Co. of Tex., 544 S.W.2d 627 (Tex. 1976).  But the court in Redinger v. Living, Inc.,
689 S.W.2d 415, 418 (Tex. 1985), adopted the limited-duty rule set forth in
Section 414 of the Restatement (Second) of Torts that, when the premises owner
or general contractor retains some control over the independent contractor=s work, it must exercise that control
with reasonable care.  Koch Ref. Co.
v. Chapa, 11 S.W.3d 153, 155 (Tex.
1999); Restatement (Second) of Torts
' 414 (1965).  A general contractor can retain the right to
control an aspect of an independent contractor=s
work or project so as to give rise to a duty of care to that independent
contractor=s
employees either by contract or by actual exercise of control.  Lee Lewis, 70 S.W.3d at 783.  To examine DT Construction=s Aretained
control@ in
analyzing whether it owed a duty to Andrews, we begin with a review of the
construction contract and subcontracts.  See,
e.g., Dow Chem. Co. v. Bright, 89 S.W.3d 602 (Tex. 2002); Lee Lewis, 70 S.W.3d at
788-90.








The contracts in this case appear to be similar to
those in Lee Lewis.  Just as in Lee
Lewis, the contract between Sheldon
Independent School
 District and the general contractor, DT Construction, was a
standard form of The American Institute
 of Architects.  This one was entitled AStandard
Form of Agreement Between Owner and Contractor where the basis of payment is a
Stipulated Sum@ (AIA
Document A101)(the Contract).  As between
Sheldon ISD and DT Construction, Articles 3.3.1 and 3.3.2 set forth the
supervision and construction responsibilities of the general contractor:

3.3.1
The Contractor shall supervise and direct the Work, using the Contractor=s best skill and attention.  The Contractor shall be solely responsible
for and have control over construction means, methods, techniques, sequences
and procedures and for coordinating all portions of the Work under the
Contract, unless Contract Documents give other specific instructions concerning
these matters.

 

3.3.2
The Contractor shall be responsible to the Owner for acts and omissions of the
Contractor=s employees,
Subcontractors and their agents and employees, and other persons performing
portions of the Work under a contract with the Contractor.

 

In Article 10.2, DT Construction agreed to take reasonable
precautions for the safety of employees on the work.  In Article 5.3.1, Sheldon ISD required DT
Construction to require each of its sub-contractors to be bound to DT
Construction as general contractor by the terms of the Contract and Ato assume toward the Contractor all the
obligations and responsibilities which the Contractor . . . assumes toward the
Owner and Architect.@

In Paragraph 4(a) of its subcontract, Brien Call
Electric agreed to be bound by the terms of the Contract and Aexpressly assume[d] toward Contractor
[DT Construction] the same obligations of any indemnity or hold harmless
agreement which Contractor has had to assume toward Owner.@ Thus, as between DT Construction and
Brien Call Electric, Brien Call Electric agreed to be Asolely
responsible for and have control over construction means, methods, techniques,
sequences and procedures@
relating to the work agreed to in its subcontract; to be responsible for the
acts and omissions of its employees;[3]
and to take reasonable precautions for the safety of its employees.








In Paragraph 8, Brien Call Electric agreed to Aat all times supply adequate tools,
appliances and equipment, a sufficient number of properly qualified workmen and
a sufficient amount of materials and supplies of proper quality to prosecute
said work efficiently.@  Brien Call Electric also agreed in Paragraph
22  to Arequire
his employees, on this project, to attend brief safety meetings that will be
called by the contractor or his representative. . . . [A]nd his employees shall
abide by all safety regulations . . . of the Contractor or his representative.@ 
Thus, as in Lee Lewis, DT Construction required its
subcontractors to agree to adhere to safety rules and attend safety
meetings.  Although Brien Call Electric
agreed to be responsible for the safety of its own workers, DT Construction had
the right to monitor its efforts and did so. 
Here, as Justice Hecht pointed out in his concurring opinion in Lee
Lewis, Athe
general contractor had thorough control of safety on the site, which is typical
for major construction projects.@
Lee Lewis, 70 S.W.3d at 788.

The Texas Supreme Court has stated that safety
requirements, such as DT Construction imposed on its subcontractors, give rise
to at most Aa narrow
duty of care.@  Hoechst-Celanese Corp. v. Mendez, 967
S.W.2d 354, 357 (Tex.
1998).  The supreme court in Mendez
cited Tovar v. Amarillo Oil Co., 692 S.W.2d 469, 470 (Tex. 1985), where
it held that an oil company breached a duty of care to a drilling contractor
employee by not exercising its contractual right to suspend drilling operations
after it learned that the drilling contractor was violating a specific critical
safety provision in the drilling contract. 
We note that the court in Lee Lewis also imposed liability on the
general contractor because the general contractor knew of a dangerous condition
before the injury occurred and approved acts of the subcontractor that were
unsafe.  Here, it is conceded that DT
Construction did not know about the scaffold, and there is no evidence that
Brien Call Electric had been engaged in unsafe practices.

The Texas Supreme Court has also emphasized that,
for the general contractor to be liable for negligence, its supervisory control
must relate to the condition or activity that caused the injury. Mendez,
967 S.W.2d at 357; Clayton W. Williams, Jr., Inc. v. Olivo, 952 S.W.2d
523, 528 (Tex.
1997).  Under the subcontract, DT
Construction did not have control over how the electrical work was done by
Brien Call Electric.  Thompson and
company supervisor, Patrick Beadles, testified to that same effect.  As Patrick Beadles put it, general
contractors hire electricians because they are specialized in that area.  Andrews acknowledged that no one from DT
Construction attempted to tell him how to do his job or supervised his work.  DT Construction did not have supervisory
control over the manner and means of the activity that caused the injury B the installation of electrical wiring.








Because it is undisputed that DT Construction did
not know about the scaffold before the injury occurred and did not approve any
acts that were dangerous and unsafe, Andrews relies on the retention of control
reflected in the Contract with Sheldon ISD and argues that those provisions
imposed a duty on DT Construction to make the workplace safe for Andrews.  Andrews argues that he was a beneficiary of
the Contract between Sheldon ISD and DT Construction where DT Construction
agreed to be responsible for the manner and means of construction.  This argument fails because DT Construction
then contracted with its subcontractors for the subcontractors to be
responsible for the manner and means of accomplishing the work required in
their subcontracts.  The provisions in
the Contract merely required DT Construction to take responsibility for any
claims against Sheldon ISD arising out of the actions of DT Construction or its
subcontractors.  See Elliott-Williams
Co. v. Diaz, 9 S.W.3d 801, 804-05 (Tex.
1999).  Our focus is on the subcontract.

Although DT Construction has not disputed that it
retained control over safety, DT Construction argues that there was no evidence
that it was negligent despite the jury=s
finding that it was 25% negligent.  DT
Construction is correct.  First, there
was no evidence that DT Construction had anything to do with the scaffold or
even knew about it.  Second, Andrews
presented no expert testimony on what a reasonably prudent general contractor
would have done under the same or similar circumstances.  Third, and perhaps most important, DT
Construction did not owe a duty to Andrews under the circumstances of this
case.  See Bright, 89 S.W.3d 602; Koch
Ref. Co., 11 S.W.3d 153.  DT
Construction did not have the right to control the means, methods, or details
of the independent contractor=s
work.  Bright, 89 S.W.3d at
606-07.








Requiring its subcontractor, Brien Call Electric,
to observe and promote compliance with general safety guidelines and other
standard safety precautions did not impose an unqualified duty of care on DT
Construction to ensure that the independent contractor=s
employees did nothing unsafe.  See
Koch Ref. Co., 11 S.W.3d 153. 
Requiring its subcontractors to have their employees learn and follow
general safety procedures subjected DT Construction to only a narrow duty to
make certain that its safety requirements and procedures did not unreasonably
increase the probability and severity of injury.  Bright, 89 S.W.3d at 607.  The subcontractor, Brien Call Electric, was
in a better position to inspect, eliminate, or warn Andrews of the danger
arising from its work than DT Construction. 
See Shell Chem. Co. v. Lamb, 493 S.W.2d 742, 746-48 (Tex. 1973).  Under the facts of this case, the mere
contractual retention of control over safety on a construction site was not
sufficient to impose liability on the general contractor when the independent
contractor=s
employee was injured.  

We recognize that the jury found that DT
Construction had Aa right
to control the use of the scaffold@
by Andrews (implying that DT Construction breached a duty to Andrews) and was
25% responsible for Andrews=s
injury.  DT Construction has not argued
that it owed no duty to Andrews.  DT
Construction did challenge the jury=s
finding of negligence on its part, and there can be no negligence if there is
no duty.  The question of duty is a
matter of law.  Caterpillar, Inc. v.
Shears, 911 S.W.2d 379 (Tex.
1995).  The trial court=s judgment should be affirmed on the
basis that DT Construction owed no duty to Andrews.  But, even assuming DT Construction had some
limited duty, we find that the jury=s
allocation of proportionate responsibility was not against the great weight and
preponderance of the evidence nor was it manifestly unjust.  We overrule appellant=s
second issue.

This Court=s
Ruling

The judgment of the trial court is affirmed.

 

TERRY McCALL

JUSTICE

 

August 31, 2006

Panel
consists of:  Wright, C.J., and 

McCall,
J., and Strange, J.











[1]Andrews stated that a journeyman electrician has to
have had at least 8,000 hours of on-the-job training under the supervision of a
master electrician and pass an examination.





[2]A general contractor in control of the premises is
charged with the same duty as an owner or occupier.  Clayton W. Williams, Jr., Inc. v. Olivo,
952 S.W.2d 523, 527 (Tex.
1997).





[3]Although Brien Call referred to his electricians as
independent contractors, we have referred to them as employees because Brien Call
Electric had control over the manner and means of their work and supervised
them.